## UNITED STATES et al. v. DE FOREST RADIO TELEPHONE & TELEGRAPH CO. et al.

(District Court, D. Delaware. February 15, 1927.)

No. 549.

1. Patents ⬉112(4), 114—Patentee, awarded priority in interference proceeding and by Court of Appeals of District of Columbia, will prevail in subsequent suit, in absence of testimony carrying thorough conviction (Rev. St. § 4915 [Comp. St. § 9460]).

Where patentee prevailed in interference proceedings and in Court of Appeals of District of Columbia on issue of priority of patent claim, he will prevail in subsequent suit, under

Rev. St. § 4915 (Comp. St. § 9460), unless contrary is established by testimony carrying thorough conviction.

**2. Patents ⬦⟹328—1,507,016, for means of producing electrical oscillations or alternating currents, held entitled to priority (Rev. St. § 4915 [Comp. St. § 9460]).**

In suit under Rev. St. § 4915 (Comp. St. § 9460) De Forest patent, No. 1,507,016, for means of producing electrical oscillations or alternating currents, *held* entitled to priority.

**3. Patents ⬦⟹91(2)—Corroborated oral testimony of inventor as to what was in mind, or what he did at certain time, is admissible to establish priority.**

While uncorroborated statements of inventor as to what is in mind, or what he did at certain time, cannot be accepted to establish his priority over rival's established date, such rule does not exclude oral testimony of litigant, which is sufficiently corroborated.

**4. Patents ⬦⟹91(2)—Sketches reproduced from memory, by technically trained man interested in matter several years after inventor drew original, has evidentiary value on priority.**

Sketches reproduced from memory by technically trained man, interested in specific matter, several years after inventor drew original, has evidentiary value in suit involving priority of patent, since disclosures of that character are not readily forgotten by such a man.

**5. Patents ⬦⟹37—Novel means of producing electrical oscillations or alternating currents without means of control involved invention, if result was practical.**

Novel means and methods of producing electrical oscillations or alternating currents involved invention, if result to production of which they were employed was practical, notwithstanding there was no means of controlling amount of regeneration, and frequency at which it occurred.

In Equity. Suit by the United States and another against the De Forest Radio Telephone & Telegraph Company and others, in which defendants filed counterclaims. Counterclaims and bill of complaint dismissed.

See, also, 18 F.(2d) 345.

Clifton V. Edwards and Harry Knight, Sp. Asst. Attys. Gen., and David J. Reinhardt, U. S. Atty., of Wilmington, Del., for plaintiffs.

Samuel E. Darby, Jr., of New York City, for defendants De Forest Radio Telephone & Telegraph Company and Lee De Forest.

Drury W. Cooper, H. Frank Wiegand (of Cooper, Kerr & Dunham), and Thomas Ewing, all of New York City, for defendants Westinghouse Electric & Mfg. Co. and Edwin H. Armstrong.

Harry E. Dunham, of Schenectady, N. Y., and William G. Mahaffy, of Wilmington, Del., for defendants General Electric Co. and Irving Langmuir.

William R. Ballard, of New York City, for defendant American Telephone & Telegraph Co.

MORRIS, District Judge. In the four-party interference in the Patent Office of De Forest v. Langmuir v. Armstrong v. Meissner, the Court of Appeals of the District of Columbia awarded priority to De Forest (54 App. D. C. 391, 298 F. 1006), and pursuant thereto patent No. 1,507,016 was issued to De Forest on September 2, 1924. Thereafter the suit at bar was instituted, under R. S. § 4915 (Comp. St. § 9460), by Meissner and his assignee, the United States of America, against the other parties to the interference, their assignees, and a licensee, to obtain a decree authorizing the issuance of a patent to Meissner for the invention defined in the counts in the interference. In their respective answers the General Electric Company, assignee of Langmuir, and Westinghouse Electric & Manufacturing Company, assignee of Armstrong, each here sets up a counterclaim asserting ownership of the invention under their several assignments, and prays for the same relief as does the plaintiff. De Forest and his assignee, De Forest Radio Telephone & Telegraph Company, allege priority of De Forest. The American Telephone & Telegraph Company, alleged by the plaintiff to be a licensee under the De Forest patent, by its answer asserts an interest in the invention under each of the applications but takes the position that the patent to De Forest was properly issued.

The issue here, as in the interference in the Patent Office, is mainly that of priority. The dates awarded the several parties in the Patent Office proceeding are those to which they here severally make claim, namely, De Forest, August, 1912; Armstrong, January 31, 1913; Meissner, April 9, 1913; and Langmuir, August 1, 1913; but each of the junior parties under that allotment denies that his senior or seniors are entitled to the respective dates claimed. Consequently the first question for consideration is whether, for the subject-matter in issue, De Forest is entitled to the date claimed by him. The subject-matter is defined by the pleadings, in the language of the counts of the Patent Office proceedings, thus:

"1. Means for producing sustained electrical oscillations comprising an oscillatory circuit having two electrodes in an exhausted receptacle and a second circuit coupled thereto having a conducting body interposed between said electrodes.

"2. Means for producing sustained electrical oscillations comprising an oscillatory circuit having two electrodes, a second circuit coupled thereto having a conducting body interposed between said electrodes, and means for varying the frequency of the produced oscillations.

"3. The method of producing electrical alternating currents which consists in causing current to flow in one of two coupled circuits and varying the flow of current in the first circuit by impressing the potential induced in the second circuit upon a conducting body interposed between two electrodes in the first circuit."

These counts were framed with care in the Patent Office, and were inserted by amendment in his application by each of the parties to the interference. I think they are clear. Their elements and steps have for their object the production of electrical oscillations or alternating currents. The oscillations must be sustained, not damped. Taking the first count as illustrative, the means comprise an oscillating circuit, or one in which alternating current may flow; two electrodes—plate or wing and filament; an exhausted receptacle—a radio tube or audion; a second or grid filament circuit, coupled to the first circuit, and having a conducting body, a grid, interposed between the plate and filament. An added element of the second count consists of means for varying the frequency of the oscillations produced. The three electrode radio tube or audion was old. The circuits with which it had been connected before the invention defined by the claims consisted in the main of a grid filament, or input circuit, and a plate filament, or output circuit, each of which might contain one or more electrical devices.

The novel feature of the first count, as I understand it, lies in its so coupling the two circuits that electrical energy from one may be transferred, fed back, from one to the other in such manner as to produce "sustained electrical oscillations" or alternating currents. Such transfer of energy involves the general functioning of the tube—described with particularity in Armstrong's exhibits Nos. 6–K and 6–L—as well as its connected circuits. Broadly and generally stated, the functioning of the tube rests upon the long-known scientific fact that, if a second element or electrode be placed within an electric light bulb and given a positive potential, an electric current, or stream of electrons carrying a negative charge, flows, unidirectionally, from the incandescent filament to the cold, second electrode. This principle was made use of in the radio art by heating the filament of the radio tube by a battery, known as the A battery, and impressing a high positive potential upon the plate by a battery, known as the B battery, put in the plate circuit.

As the current passes through the tube in one direction only, the tube functions as a rectifier of alternating current; the alternations in the opposite direction being blocked or barred. As the B battery supplies direct current only, that current, when permitted to flow steadily and uniformly, is without variation, and so without means of causing the diaphragm of the telephone, connected with the plate circuit, to vibrate. But the functioning of the grid under the influence of the alternating current of the input, or grid filament, circuit increases and decreases the flow of current passing in the tube from the filament to the plate, and thereby causes the direct current of the plate circuit to pulsate. The variations or pulsations passing through the telephones cause their diaphragms to vibrate and so be heard. If the tube does not amplify, the variations or pulsations in the plate circuit current are of no greater magnitude than are the waves of the input or grid filament circuit; but, if the tube is an amplifier, the pulsations created in the plate current will be similar in character to the variations in the input circuit, but of greater magnitude.

By the invention of the counts in suit these magnified pulsations in the current of the plate circuit are transferred back through a coupling between the circuits to the input circuit. There they augment the variations in the current of that circuit, and, consequently, the variations in the potential of the grid. Employing its increase of energy to bring about a new magnification in the pulsations of the plate circuit current, the grid starts the cycle of steps afresh. Repetition produces, not only regeneration, but eventually, if the lapse of an infinitesimal fraction of time may be so referred to, the electrical oscillations of the counts. Meissner's denial of the right of De Forest successfully to claim August, 1912, as his date of invention is a denial that De Forest then had a conception of the production of alternating current by feedback or regenerative action, and that, if he had, he was not diligent in reducing that conception to practice.

To establish his conception and reduction to practice at the time claimed by him, De Forest relies in the main upon the contemporaneous record of the things actually done by him, or by Van Etten, his instructed assist-

ant, on August 6 and August 29, 1912, as shown by his notebooks. The authenticity of the books and the regularity of the entries therein are not questioned. The entry of August 6 is this:

phones" discloses that De Forest then produced sustained oscillations, yet plaintiff asserts that it has not been made to appear that the oscillations produced were not the result of gas action, instead of regenerative action, in

"Aug. 6th. Lacking two audions complete with separate battery B's and battery A's, tried the following circuit and found that the watch ticks came through, although they were not amplified—a slight loss, probably.

"When *3–4* of coil *5* is connected as indicated to *1–4* of coil *4*, get a beautiful clear tone in phones.

"This tone weakens and raises in pitch as Batt. B is increased from 15 to 18 cells. This tone can be wiped out by placing a magnet about the audion, and then the watch ticks come through as before. It also tends to disappear as the number of cells in Batt. B is increased. This phenomenon is apparently similar to the 'howl' produced in an ordinary CB telephone when receiver is placed against transmitter, but nevertheless, as shown by variation of number of cells in Batt. B and by magnetic wiper, is also intimately associated with the audion."

While the sketch shows every element of the first claim, and while the statement in the note that he obtained "beautiful clear tone in

that it has not been established that the tube employed was an amplifying tube, or, at least, that its amplifying power was sufficient to overcome the losses in the circuit.

[1, 2] As the finding of the Court of Appeals of the District of Columbia upon the same issue was in favor of De Forest, he must prevail here as well, unless the contrary is established by testimony which, in character and amount, carries thorough conviction. Morgan v. Daniels, 153 U. S. 120, 125, 14 S. Ct. 772, 38 L. Ed. 657; Earles v. A. W. Drake Mfg. Co. (C. C. A.) 300 F. 265. In character the testimony here differs not at all from that adduced in the Washington proceedings. That presented here by witnesses who did not testify in the Patent Office proceeding consists, in the main, of pointing out two possible reasons, not expressly set out in the oral evidence or argument in the interference, why the oscillations produced by De Forest were not produced by the means and in the method called for by the counts.

One of these reasons is that the tickler

coil, the coil in series in the plate circuit inductively coupled to the grid circuit, constituted a path enabling the oscillations of the input circuit to reach the telephones without passing through the audion, thereby lessening the energy to be amplified, if amplification there was. The other is that any energy fed back through the tickler coil from the output to the input circuit would probably pass, upon arrival at the latter circuit, not to the grid, but to coil 4 and the effect of the feed-back action be thereby lost. But this testimony, as I view it, is but a statement in words of possibilities which the drawing itself, in evidence at Washington as well as here, suggested and made necessary to be considered.

Moreover, I think the record before the Court of Appeals at Washington supports the findings of that court, and that the record here does not warrant a different finding. It is true that the audions in use in 1912 were softer—that is, contained more residual gas —than do the audions of to-day. It is also true that they were often of low amplifying power. But it is likewise true that audions, even as then constructed, were amplifiers, though in varying degrees; that the use of a soft tube does not prevent the production of oscillations by feed-back action; that the De Forest circuit was, generically at least, a feed-back circuit (Loftin, XQ. 215); that the "beautiful clear tone in phones" established that sustained electrical oscillations or alternating currents were being produced (Loftin, XQ. 226–228; Armstrong, XQ. 402–404; Hogan, XQ. 145–146); that the oscillations evidenced by the clear tone in the telephones began when 3–4 of coil 5 was connected as indicated to 1–4 of coil 4, and ended when that connection was broken (De Forest note of August 6; Armstrong, XQ. 408); and that Armstrong testifies that the clear tone or singing in the tube is not due to gas action, though complicated by it, but is due to the plate circuit reacting on the grid circuit—that is, to feed-back action (Q. 277; XQ. 42–44).

The plaintiff questions none of these statements. It disagrees, however, with the testimony of Armstrong and the evidence adduced by De Forest that the oscillations were due to the inductive coupling of the circuits, and takes the position that, notwithstanding the other facts stated, the singing was or may have been due, nevertheless, to gas action. Such action is explained by Loftin, Q. 25. See, Eisenstein patent, No. 921,526. Singing in the telephones may be produced by gas action. Production of oscillations by gas action requires but one circuit—that containing the battery. It does not depend upon the grid and its functions, but rests upon the change in resistance of the gaseous medium in the tube. In support of its gas-action contention, the plaintiff construes the note to say that there was no amplification. I do not so understand the note. The presence of amplification is to be ascertained by determining the difference between the input and the output sides of the tube. Considering the great losses shown in the De Forest circuit, the fact that the sound heard in the telephones on August 6 was only slightly less than that transmitted is, I think, strong evidence that the weakened vibrations arriving at the input side of the tube were much amplified by it.

Some reliance is placed by the plaintiff upon the statement in the note that the singing could be "wiped out by placing a magnet about the audion," but this is as true of feed-back oscillations as of those resulting from gas. Again, the plaintiff finds support for its contention in the further statement of the note that the tone of the singing weakens and rises in *pitch* (which is dependent upon the frequency of the vibrations) as the B battery is increased, yet elsewhere the plaintiff concedes that "the frequency of the [gas] oscillations, once started, is governed by tuning the circuit, as in the case of oscillations created by feed-back." De Forest, who was familiar with gas-action oscillations and sounds produced thereby, recognized the tone obtained on August 6 as "similar to the 'howl' produced in an ordinary CB [common or central battery] telephone when receiver is placed against transmitter," and it is conceded that such telephone howl is produced by feed-back action.

The added element of the second count— means for varying the frequency of the produced oscillations—is satisfied by the act of De Forest, recorded in the note, of increasing the voltage of the B battery. Plaintiff's witness admitted that, while changing the voltage of the B battery is a poor means for varying the frequency of the produced oscillations, and, consequently, the pitch of the sound, yet it has that effect in some degree. (Loftin, Q. 250–262.) Moreover, the De Forest entry of August 29 discloses that De Forest knew how to and did change the frequency of feed-back oscillations by a change of capacity. That entry consists of the following sketch:

The note accompanying the sketch reads in part:

"Reversing the connections to the secondary wdg of coil 1 makes all sorts of musical notes in Brandes phones then reversing connection to one wdg of coil 5 the musical notes, whistle, etc., are gone, and the ticks come thru as before. When coils are so connected up that a whistle or hiss is produced, all sorts of whistles & musical notes of various pitches and intensities can be produced by putting very small capacities—such as the capacity of one's body or from thumb to finger—between ground and top grid, wing, or filament, or by crossing any or either or all of these points thru small capacities."

Though this drawing shows no coupling (outside of the audion) between the output and the input circuit, the oral evidence is that, when the circuit was set up, the coils were so placed on the table that there was an inductive relation between coil No. 1 and coil No. 5 by means of which energy was transferred from the plate circuit to the grid circuit.

[3] While the uncorroborated statements of an inventor as to what was in his mind, or what he did at a certain time, cannot be accepted to establish priority for him over the established date of his rival, yet such rule does not exclude oral testimony, or nullify that of a litigant when such oral testimony is sufficiently corroborated. The oral testimony here finds sufficient corroboration in the record of the successive reversal of the connection to the coils, and in the recorded consequence thereof, for such reversal of connections establishes that the produced oscillations resulted from feed-back action. (Hogan, XQ. 261–262.) In addition to disclosing the production of electrical oscillations by feed-back action, and the ability to vary or control the frequency of the oscillations so produced, by adding or subtracting capacity, the note of August 29 likewise establishes that the oscillations depend, and that De Forest knew it, not only upon the feeding back of the energy, but upon its being fed back in the right phase relation to augment, and not oppose, that in the grid circuit.

De Forest's testimony that at the time he recognized in his work of August 6 and August 29 the presence and nature of the invention defined by the counts, and that it would be serviceable for certain uses, is corroborated, not only by the record entries, but by Van Etten and Logwood as well. De Forest's conception and perception of the invention were further supported in the proceedings at Washington by the testimony of John Stone who stated that De Forest disclosed to him in October, 1912, that he had produced sustained electrical oscillations by regenerative action, and that the disclosure consisted in part of a sketch reproduced by the witness thus:

Stone said:

" * * * This drawing showed me for the first time what the necessary relations were in order that the oscillations in the audion might be self-sustaining. I noticed in this drawing that Dr. De Forest made the coil $S^2$ was drawn at an angle to the coil $P^2$ and I asked him why he drew it in that way, and he explained that he found that it was necessary to adjust the mutual induction in the feed-back circuit in order to obtain the best results. He explained that the coils $P^1$ and $S^1$ and $P^2$ and $S^2$ were what he called pancake coils, and $P^2$ and $S^2$ were so arranged with a hinge at the base of the two coils, so that they could be separated at an angle from each other. * * * "

The testimony of Stone is not in the record here, save for the purpose of showing the evidence upon which the finding of the Court of Appeals of the District of Columbia rests; but the sketch is. The sketch itself shows, not only the use of pancake—that is, high frequency—coils, but as well that they are in an adjusted relationship. De Forest's August work was with low frequency.

[4] But though, upon objection made by De Forest to the counts as first proposed, the words "high frequency oscillations" were stricken therefrom, and the words "electrical oscillations" substituted in their stead, and the counts thus made to apply equally to oscillations of high frequency or of low frequency, the disclosures of the Stone sketch are not without evidential value, for they corroborate the other evidence of the case that De Forest knew and understood the principle of his August work. I see no reason for discounting the sketch as reproduced by Stone, notwithstanding several years passed after De Forest drew the original before Stone reproduced it from memory. Disclosures of that character to a technically trained man, interested in the specific matter, are not readily forgotten.

But, as I view the matter, neither the Stone testimony nor the Stone sketch is needed, so far as the plaintiff's attack is concerned, to uphold the date claimed by De Forest, for in August he met by physical act, as well as by mental conception, all the requirements of the three counts in issue. I think he did not abandon his invention, and that he is entitled to the claimed date as his date of conception and reduction to practice of the invention in issue, unless defeated by the separate attack of Armstrong, for Langmuir makes no independent assault upon De Forest, but directs his efforts to the defeat of Meissner.

[5] Armstrong takes the position that the counts, to be valid, must not be construed to call broadly for the production of electrical oscillations by a transfer of energy from the output to the input circuit, but to include, by necessary implication, means for controlling both the amount of the regeneration and the frequency at which regeneration occurs, in that without such control, he contends, there is want of utility, and, consequently, of patentability, and that, when so construed, the work of De Forest fails to meet the requirements of the counts. The counts, however, are for novel means and method for producing alternating current, not for the application of alternating current so produced to a new use. It seems to me that Armstrong's contentions, if sustained, would change the object and purpose of the invention from that stated in the counts to a specific use of the oscillations produced. The counts would thus be narrowed and restricted. Such limitation of their scope is, I think, neither warranted nor essential to their validity. The means and method set out in the counts were novel, and, if the result to the production of which they were employed was a practical one, involved invention. Robinson on Patents, § 77 et seq.

That alternating current produced by the stated means and method has utility, even without greater control than is found in De Forest's work of August, 1912, and that certain practical uses of the oscillations produced were then appreciated by him are amply sustained by the evidence. Moreover, the evidence further discloses (De Forest, Q. 20–22; Van Etten, Q. 14; Phila. Rec., put in record here by stipulation; Loftin, XQ. 377–383; Armstrong, XQ. 856) that it was widely known, even before August, 1912, that the frequency of an alternating current may be varied, tuned, by varying the inductance or capacity of the circuit in which it flows. That which was not known was how to produce the oscillations or alternating current. That a patent monopoly may be as broad as the means and method here claimed for producing such oscillations was held in Armstrong v. De Forest Radio Telephone & Telegraph Co. (D. C.) 279 F. 445, where the decree enjoined the use of "any and all arrangements of audion circuits by which oscillating current energy is transferred from the output or plate circuit to the input or grid circuit, to sustain the oscillations in the grid circuit,"

and the Circuit Court of Appeals said (280 F. 584, 597): "We think the decree is not too broad, but properly describes what the inventor conceived, and for which protection must be accorded to him."

The evidence, both "new" and old, here presented by Armstrong in support of his attack upon De Forest's work, has been considered; but it is not sufficient, I think, to overcome the evidence of De Forest in support of his claimed date. I am of the opinion that the counts are valid as they stand, and that the decision of the Court of Appeals of the District of Columbia, awarding to De Forest priority with respect to the invention of those counts, was right.

The motion of Armstrong to dismiss the bill of complaint upon the ground that the United States of America is without authority, under the Constitution, to issue to itself a patent, or to hold or exercise a patent monopoly, need not be considered; for, in view of the conclusion arrived at upon other grounds, but without aid from Morgan v. Daniels, the counterclaims and the bill of complaint must be dismissed.