## UNION SIMPLEX TRAIN CONTROL CO., Inc., v. GENERAL RY. SIGNAL CO. et al.

### No. 1572–I.

District Court, W. D. New York.
July 9, 1935.

Donovan & Raichle, of Buffalo, N. Y. (Frank Raichle and Albert Henry, both of Buffalo, N. Y., of counsel), for plaintiff.

Harris, Beach, Folger, Bacon & Keating, of Rochester, N. Y., and Edwards, Bower & Pool, of New York City (Clifton V. Edwards and Frank A. Bower, both of New York City, and Neil D. Preston, of Rochester, N. Y., of counsel), for defendants.

KNIGHT, District Judge.

This is a patent suit for infringement brought by Union Simplex Train Control Company, Inc., against the General Railway Signal Company, as manufacturer, and the New York Central Railroad Company, as customer and user. The patents involved are No. 1,374,954, letters patent issued April 19, 1921, and patent No. 1,470,107, letters patent issued October 9, 1923. The only claims controverted are claim 4 of the first-numbered patent and claim 11 of the second-numbered patent.

These patents are for an apparatus for the control of trains by effecting automatic brake applications under danger conditions. The art of automatic train control was not new with the disclosures of these patents. It long antedates them and shows, as it has progressed, many improvements which are landmarks to hu-

man ingenuity. Naturally, changes, through the developments of various systems or devices, have been directed to the perfection of a type which will insure to the greatest possible degree the effectiveness and reliability of the system employed. Indeed, in the period commencing in 1908 and continuing until patent No. 1,470,107 was issued October 9, 1923, the patentee, to whom the plaintiff herein has succeeded in title, has been granted many patents related to systems for automatic train control. The defendant General Railway Signal Company for many years has been engaged in the manufacture of railway signal equipment and has also become possessed of the title to numerous patents for automatic train control.

The system of automatic train control as designed by the patents, including the claims in question, may be generally described as including a construction known as an armature made of magnets stationed on the track and connected with the regular track signal system; a train or vehicle-carried device, consisting of

are provided so that the engineer may manually release the brakes.

Claim 4 of patent No. 1,374,954 reads: "Vehicle controlling apparatus embodying a track armature arranged for the passage of a responsive vehicle device, and laminated longitudinally of the track in planes in which said device moves." It is necessary at the outset to interpret this claim. It is the plaintiff's contention that the invention is an "inert" track device, along the track, disposed in a certain way and constructed in a certain way. It is the defendant's contention that the claim is for a combination of a responsive vehicle device movably mounted on a vehicle and a track armature laminated in a certain direction. It is necessary to examine the drawings and specifications to determine the intended invention. The specification states the object to be "to provide novel magnetic means on the track for influencing the vehicle equipment, having improved features to enhance its utility." The pertinent parts of the vehicle and track devices are shown in this drawing:

magnets co-operating with the magnets in the armature on the track and so connected through electric circuits on the vehicle as to open an electro-pneumatic valve whereby air pressure is forced into a casing, inclosing the engineer's brake valve stem and against an oscillatory member attached to such valve stem, thereby causing an automatic application of the brakes when danger conditions arise. Means for releasing the air pressure in the casing

Such drawing shows a track armature and a co-operating vehicle device. Each is provided with magnets adapted to align with an air gap of approximately two inches. Through magnetic influence, certain electric circuits on the train connected with the vehicle device are changed, under danger conditions, to make an automatic application of the brakes. The train-carried device shows a box containing the magnets numbered 46, 47,

and 48. Under normal conditions these are energized by direct current provided on the vehicle. The track device shows three magnets numbered 40, 40, and 39, supported on rocker arms and enclosed in metallic casing 41. Under clear conditions the solenoid 44 is energized to raise the magnet 39 to its upper position and hold the two magnets numbered 40 to the lower positions. There is then no change in the vehicle circuits. When the solenoid is de-energized, through influence of the track signal system, magnet 39 drops, magnet 40 raises, and magnet 48 is pulled down by magnetic attraction. Then the magnets 46 and 47 become de-energized, thereby causing the electric pneumatic valve to open and let in air pressure to the actuator on the engineer's brake valve and automatically apply the brakes.

The claim refers to "A vehicle controlling apparatus." Each claim of the patent has the same reference. This evidently has reference to the system as a whole. Claim 4 states what particular part of such system is intended to be included therein. It recites that such particular part is a track armature, located in a particular place, composed in a particular and positioned as to its parts in a particular way. The specification and the drawing show the particular place. They show the track armature composed of the magnets aligned with magnets on the vehicle. The magnets on the vehicle are the "responsive vehicle device." They pass over the armature magnets. The armature magnets are described in the claim and specification and shown in the drawing as being laminated, the laminations running "longitudinally of the track."

The specification describes the magnets as movable, and movable in an up and down direction. The claim, in accord with the specification, also describes the armature as being laminated "in planes in which said device moves." It is true that the movement of the entire vehicle-carried device moves with the vehicle longitudinally of the track, but it seems to me that the reference to "device," in the connection in which that word is used in the claim, is to the movable magnets. That interpretation is consistent. The magnets move in a vertical direction. The laminations extend in the same direction as to the movement of the magnets and longitudinally of the track.

It accordingly seems to me that the patent relates wholly to the track device and not to a combination of track and vehicle devices. This is further borne out by the claims in a prior patent, No. 1,372,457, issued to the same patentee. The drawings and style of such patent are similar, save that the armature is shown as solid, and there is no reference to lamination. As shown by reference heretofore made to the specifications in the patent in suit, such patent is designed to show "improved features to enhance utility." The obvious reference is to the type of armature. It seems that the patent in suit was allowed on that distinguishing feature.

The next consideration is whether defendant infringes. In this connection attention may be drawn first to a general description of defendant's so-called auto-manual system of train control. The pertinent parts of the track and train device are shown in this diagram:

The system shows a track device or U-shaped core, with a choke coil on one leg, a vehicle-carried core of corresponding U shape, with primary and secondary coils opposite to each other, stationed to pass directly over the track core; a system of electric circuits arranged to cause air to be retained in and forced within a so-called actuator, thereby applying or withholding application of the brakes. The track core is termed an "inductor"; the vehicle core, the "receiver." The system is supplied with a battery on the vehicle. There is produced by electro-magnetic induction from the "inductor," as the coils pass each other, under danger conditions, an increased voltage in the receiver, and this de-energizes a relay on the vehicle which controls the brake application mechanism. The so designated primary coil is energized from a battery and produces a magnetic flux through the laminated core of the receiver and the secondary coil thereon. When the locomotive is traveling under clear conditions, as indicated on the diagram, some of the magnetic flux passes between the pole pieces and through the secondary coil of the receiver. No voltage is then being induced in the secondary coil, and the relay RI is kept energized by current from the battery. When the "receiver" passes over the track "inductor" under stopping conditions, the choke coil on the "inductor" is in open circuit, and the magnetism passing through the secondary coil is greatly increased, and there is an induced voltage in the secondary coil. This opposes the battery voltage, and a relay is thereby caused to become de-energized, and the connected relay circuits are also opened. Breaking these circuits causes an electro pneumatic valve to open and permits compressed air to be admitted and applied to the actuator on the engineer's brake valve. It will be observed that the action on the "receiver," when it passes over the "inductor," is dependent upon whether the choke coil is on open circuit or otherwise.

A distinguishing feature in the two devices in question is that defendant's vehicle cores are stationary; plaintiff's are movable. In the former physical motion is not relied upon; in the latter it is. In the former the "inductor" is the inducing element of the current which causes the opening of a relay; in the latter physical motion resulting from magnetism is required before a similar current results. In defendant's system, energizing or de-energizing the coil on the track core controls the vehicle circuits when the devices pass. In plaintiff's system they are controlled by energizing or de-energizing the solenoid which causes the raising to or lowering from operating position of circuit controlling magnets. Defendant's track and vehicle cores are both laminated. Laminations of the track inductor run longitudinally of the track and vertically as regards the position of the receiver. Defendant's track device is a short core, 18 inches in length, the ends are flared or spread out, and upon each end is positioned a spaced pole piece. Plaintiff's armature is obviously and necessarily much longer. Defendant employs a coil on the arm of the inductor, and plaintiff has a solenoid to control the magnetism and electro magnetism. Both systems employ an electrical effect. Plaintiff employs a physical motion to bring the electrical effect into play.

The use of a laminated structure of iron and the purpose served have long been known. A laminated armature is more efficient as a conductor of electro-magnetism as such lamination tends to prevent the flow of so-called eddy currents through the armature. These eddy currents may be described as an influence within the armature tending to resist the usual and ordinary flow of electro-magnetism therein. The text-writers long before the alleged patent was conceived had described with great detail the cause of so-called eddy currents in solid iron structure such as armature and the effect of such eddy currents upon the utility of a solid structure. They had in detail explained that by the lamination of a structure such as an armature, that is, by cutting the solid into strips and by insulating them as between themselves, the flow of eddy currents would be lessened and the efficiency of the structure increased.

In Dynamo-Electric Machinery, a manual for students of electro-technics, published in 1896, by Thompson, is found an extended discussion of the subject of laminated structures of iron and the purpose of such lamination. It is pointed out in the specifications here that the purpose of lamination was to "avoid stray eddies of magnetic flux." Thompson describes the benefits from lamination as

preventing "the generation of parasitic eddy currents." He says: "in the iron of the armature cores, if not properly laminated, internal eddy-currents * * * may be set up, absorbing energy and producing detrimental heat * * *." In 'The Magnetic Circuit,' by V. Karapetoff, published in 1911, in New York and London, page 40, is found this statement: "Iron is an electrical conductor; therefore when a magnetic flux varies in it electric currents are induced along closed paths of least resistance linked with the flux. These currents permeate the whole bulk of the iron and they are called eddy or Foucault currents. Eddy currents cause a loss of energy which must be supplied either electrically or mechanically from an outside source. Therefore, the iron cores used for variable fluxes are usually built of laminations, so as to limit the eddy currents to a small amount by interposing in their paths the insulation between the laminations." And further: "The rules for the proper lamination of structure are different in the different parts; for in the armature core it is desired to cut off all circulation of current that might be induced parallel to the armature conductors; and in the armature conductors it is desired to cut off all flow of current from one side or edge of the conductor to the other. The planes of lamination must of course be arranged to cut right across the direction in which the parasitic current might otherwise flow." Dynamo-Electric Machinery, supra. And further: "The core must be laminated in planes perpendicular to the lines of flow of the eddy currents, so as to break up their paths and at the same time not interpose air-gaps in the paths of the lines of force." The Magnetic Circuit, supra.

The defendant presents as anticipations: Stern patent, No. 559,872, May 12, 1896; Kingdon's inductor alternator device, described by Thompson in his book Dynamo-Electric Machinery, supra; Oler patent, No. 1,116,320, issued November 3, 1914; Dodgson and Howe patent, No. 726,113, issued December 3, 1907; Patterson patent, No. 951,546, issued March 8, 1910; the French patent Hostache, No. 434,903, published February 16, 1912; the French patent to Du Chambon No. 465,615, published April 21, 1914; Sussmann-Hellborn patent, No. 663,398, issued December 4, 1900.

Stern shows a laminated track core, and a co-operating wheel on the vehicle axle. The car-carried device is provided with conductors in which currents are induced "to constitute in effect magnetic poles which are attracted by magnetic poles of the trackway core." The resulting mechanical movement is purposed to move a train. The Oler patent shows no laminated track device, and defendant's claim as to this patent is that the application of old teachings as to laminations would make this an anticipation. It shows a device on track and car comparable as to co-operation with the devices in question, except as to lamination of the track core. Patterson shows a train control system of the inductive type with a laminated track device but with the laminations disposed crosswise of the track. It is apparent that the vehicle laminations, run the same way, though the specifications described the core as "made in accordance with well-known transformer practice." The expert witnesses disagree as regards whether the Patterson device would work if the core extended longitudinally of the track. Patterson in any event evidently knew the value of the laminated structure. Hostache shows the intermittent inductive type of train control system. He shows a series of armature blocks on a plate or chassis supported on levers which may be manually raised and lowered. Concededly these blocks are laminated. Plaintiff claims that the device is operative only if the laminations are transversely of the track; defendant asserts that the drawings show that the laminations must run longitudinally of the track and that so constructed it is operative. Defendant calls attention to the location of brackets and bolts on the blocks as showing this direction of lamination. In any event, the patentee demonstrates the use of a laminated armature. Du Chambon shows a car-carried receiver and a track core, co-operating in an intermittent train control system. The track core is described as formed of stacks of sheet iron. The diagram in the patent does not show the arrangement of the stacks of sheet iron, but the specifications read that they "move rapidly opposite to each other, in the direction of their plane."

█ It seems to me that the devices in question are structurally and functionally so different that there is no infringement.

It would appear this must have been the view of the Patent Office in issuing patent No. 1,850,466 to Bushnell, defendant's predecessor in interest, subsequent to the issuance of patent No. 1,374,954 to plaintiff's predecessor in interest. As seen the feature distinguishing claim 4 from plaintiff's prior patent is the lamination of the armature. Patent No. 1,850,466 to Bushnell was for a laminated device to be utilized for the purpose designed by plaintiff's patent. To constitute infringement there must be substantial identity. Technidyne Corp. v. McPhilben-Keator (C. C. A.) 72 F.(2d) 242, and cases cited. None such exists here. The test of infringement is whether alleged infringing device embodies the substance of the invention and accomplishes the objects thereof in substantially the same way. This test is not met.

Again, it is evident that the Patent Office recognized the structural and functional differences, because the prior art and the prior art patents showed, as heretofore appears, automatic train control systems utilizing laminated structures for the same immediate purpose as does plaintiff.

It is not necessary to find anticipation, nor do I think there is sufficient ground for such a finding. The nearest approach to this is shown by the Stern patent employed to move a car. While this shows a laminated trackway core with laminations disposed longitudinally of the track and standing vertically co-operating with a vehicle-carried laminated wheel, the whole arrangement and differences in the parts and the use to which put are so different from plaintiff's device, that only the strongest stretch of the imagination could justify a claim of anticipation. Anticipation results only when all elements of the combination or their mechanical equivalents are found. Union Paper Bag Machine Co. v. Murphy, 79 U. S. 120, 24 L. Ed. 935. However, the widespread knowledge of the use and benefit of lamination of structure for conducting electric and magnetic forces long prior to plaintiff's conception of his device, and the application of such use in automatic train control devices in the patents hereinbefore mentioned prior to such conception, compels the conclusion that the laminated armature in plaintiff's device in and of itself alone showed no patentable novelty. It is only in its combination in the track device as a whole that such patentability lies. The patents to Du Chambon, Hostache, Patterson, and Oler disclose in each of them laminated structures devised to act as the conductors of electric and magnetic force between track and vehicle in train control systems. It is true that each does not show a laminated structure with laminations disposed as specified by plaintiff, but all show knowledge of the use and results of lamination in combinations assembled for like purposes.

A considerable part of defendant's proof was directed to show that plaintiff's device is inoperative. The proof as to the operativeness of the device is not wholly satisfactory. Proof of inoperativeness must be strong. Steinfur Patents Corporation v. J. Meyerson, Inc. (Steinfur Patents Corp. v. William Beyer, Inc.) (C. C. A.) 62 F.(2d) 238. Patentee's demonstration of the use of a model over carpenter's horses is nonconvincing as to the operativeness under railroad operation conditions. Experts have testified that the device will work; others have testified that it will not work. It seems, however, to the court, from a careful study of the various elements involved, that a device built upon the plan of physical attraction between vehicle magnets and a laminated armature is operative. It cannot be said that by the use of magnets of the weight indicated as necessary, arranged as described in the patent and with an air-gap of two inches plaintiff's device, will not operate automatically to stop a train in time of danger. The law does not require that the device be a commercial success, that it be perfect, or that it be of such general utility as to "supersede all other inventions in practice to accomplish the same object." Seymour v. Osborne, 11 Wall. 516, 548, 20 L. Ed. 33. The highest degree of perfection is not required. City of Milwaukee v. Activated Sludge (C. C. A.) 69 F.(2d) 577.

Defendant urges several grounds to show nonutility, to wit: That the brake valve actuator does not conform to the essentially normally closed circuit and that the permissive valve permits release in an unsafe condition; that the clearing magnet will be improperly operated by track rails at switches; that the magnet 48 will not hold the circuit open long enough to raise the magnets 46 and 47; that the vehicle magnets would not be

pulled down by the track armature with the air-gap suggested; that an armature of indefinite length would be required. These questions present difficulties for decision, but it is felt that the testimony supports the position that slight changes in the system will show an operative system. This meets the requirements of the patent law.

Patent No. 1,470,107 purports to describe a complete automatic train control system. Claim 11 relates to an "actuator," an apparatus used for automatically effecting the operation of the engineer's brake valve under danger conditions. In this system, danger trackway conditions are conveyed through the co-operation of a track armature and a train device to operate a valve stem, which controls the admission and release of air pressure to a member in a casing containing an oscillatory piston to which is attached the engineer's valve.

The claim reads: "A vehicle controlling apparatus embodying the combination with an air brake equipment including a brake valve having an oscillatory stem, of means for automatically operating the brake valve including a casing assembled with the brake valve and through which the stem extends, an oscillatory member within the casing having limited movement relative to the stem, and means for oscillating said member in opposite directions, said member when in normal position permitting the stem to be oscillated for operating the valve."

Pertinent parts of the specification read: "The invention includes novel means for actuating the power interrupting device, such as the throttle of a steam engine, controller of an electrically propelled vehicle, or the like; novel means for automatically operating the engineer's air brake valve and applicable to ordinary engineer's air brake valves to convert the same into a combination automatic and manually operable brake valve * * *."

The following diagrams show the immediate parts involved in the plaintiff's actuator:

A general description of the operation of the train-carried device may be given as follows: Motors are connected through gearing to a shaft from which depends a valve with a port. The train-carried electric circuit is closed under clear track conditions. It is so kept closed by the maintenance of a port in alignment with certain conduits through the operation of the motors, the rotation of a shaft, and the lifting of governor balls under the effect of centrifugal force. When danger conditions are reflected, the motors are caused to be stopped, the governor balls drop, and the port is pushed down to register with certain conduits. This allows stored air pressure to pass through a valve, raising it and allowing pressure to flow through certain ports and passages into pipe 62 to casing 106. The engineer's brake valve controls the application of the brakes.

In the plaintiff's construction casing 106 is mounted on top of the engineer's valve, and the oscillatory member in the casing is loosely fitted on the stem 107, and this member 108 carries the key 113 which moves in a groove 114 cutting the stem 107. The member 108 is adapted to move in the casing about 90 degrees. Under danger conditions air is released through the pipe 62 into chamber 111 and against the face of the piston 108, thereby causing the piston 108 to rotate and move the brake valve stem with it to the service position, i. e., braking position. When the rotary valve is moved to service position, on the occurrence of a danger condition, the engineer may move the valve stem an additional distance by the operation of his handle. This is made possible by certain lost motion between the stem and oscillatory member resulting from the groove 114. The engineer may at all times force this oscillatory member backward against pressure and so release his brakes. The apparatus is restored by the unlocking of the handle on a so-called permissive valve. Movement of this valve causes exhaustion of the pressure in chamber 111 and permits pressure to the release chamber 112 where it leaks off through port 57, not shown on diagram. It seems clear that plaintiff's system is operative provided the air pressure is forced into the casing 111 by the action of the train and track devices. The features with which we are concerned in this claim are the arrangement of the casing and various parts therein employed for the operation of the brake valve. The specifications of the claim show that the casing 107 may be located either above or below the engineer's brake handle. The claim specifies a casing, a stem extending through it, and an oscillatory member within the casing. A definite feature of this claim is the oscillatory member shown in the drawings and specifications as oscillating or moving around a stem. The Patent Office first rejected certain claims upon reference to Price patent, No. 923,297. The applicant, answering these objections, pointed out that the "actuator member oscillates about the axis of the controlling member, whereas in Price and the other references the actuating member reciprocates along the axis and does not turn upon the axis."

The defendant's train control system consists of train-carried apparatus including electric circuits influenced by trackway apparatus. It has in common with plaintiff's system track a responsive device, air valve, pneumatic valve controlled by the primary train circuit, standard air brake valve equipment, and air line from the main reservoir opened by an air valve, and it purports to make an application of the brakes through the admission and release of air pressure to two chambers. The following drawings show the pertinent parts of defendant's system:

ENGINEER'S
BRAKE VALVE
ACTUATOR

It will be seen from this drawing that defendant's structure has two piston chambers or casings, designated A and C. Two pistons LP and SP, fitted in these chambers, are joined by stem O on one side of which is formed a rack meshing with a pinion U. This piston fits loosely on an extension T connected with the upper end of the stem of the rotary valve in the engineer's brake valve. Pinion U carries a projection H which cooperates with a lug J on the driver. It also carries a latch member G engaging in normal conditions a segment T carried by the plate 61 loosely fitted on the valve stem and moved by the valve B.

Under normal running conditions pressure from the main air reservoir is supplied from a chamber above the rotary valve of the engineer's brake valve to small cylinder C. This exerts pressure on the piston SP tending to move the piston assembly to the left. Since the electro-pneumatic valve is energized under normal running conditions, the air pressure is also then supplied to the large cylinder A and acts on the large piston LP to overcome the pressure on the small

piston SP and move the piston assembly over to the right. The engineer's brake lever is adapted by the arrangement to move the stem in any direction. This diagram shows the brake valve conditions under clear signals. When the electro-pneumatic valve is de-energized to apply the brake, the pressure is exhausted from the large cylinder. This permits pressure in the small cylinder to act on the piston SP moving the piston assembly to the left. This drives the rotary valve stem to the service position.

It will be seen from the description of these two devices in question that they are quite dissimilar in methods of construction. Both operate to apply the brakes. Defendant's actuator is at the back of the brake valve handle; plaintiff's actuator is directly above or directly below. In plaintiff's device both chambers are normally free of air pressure. When pressure is applied to the oscillatory member, the latter rotates, carrying with it the brake valve stem. At the same time that such pressure is released, the pressure is applied on the opposite side of the valve to assist the engineer in returning the valve to the release position. In defendant's device, both chambers of which are normally filled with compressed air, exhausting pressure in one allows pressure in the other to act upon the piston assembly, the gear teeth of which mesh with the gear wheel attached to the brake valve stem causing the latter to turn. Release is effected by restoring the air pressure to the chamber from which it was first exhausted.

■ It seems to me that the devices of the plaintiff and the defendant as respects the parts set forth in claim 11 are so radically different in form and construction that there is no infringement with respect to this claim by the defendant. The ends accomplished by the use of such parts are the same, but the method of their accomplishment is different. The parts are not functionally equivalent. Even if it be said that there is literal similarity, there is no infringement if they are not functionally similar. "Mere ability to fit to a thing the words of a claim does not prove infringement." The question is whether the claim "construed consistently with the patentee's actual achievement, justifies the finding that there has been substantial appropriation which is always the essential of the tort known as infringement."

In view of the conclusion that the defendant does not infringe, it is not necessary that the question of anticipation be determined. However, if claim 11 is construed as readable upon defendant's patent, it seems to me that the plaintiff's claim is anticipated by the prior art. Systems to automatically apply a locomotive engineer's valve by the introduction of air pressure against some part controlling the movement of the engineer's valve are shown in various prior art patents.

A comparable construction in the prior art is Mastrangelo patent, No. 1,113,027, application filed September 13, 1913, patent issued October 6, 1914. This patent shows a pinion loosely mounted on the stem of the rotary valve. This meshes with rack teeth on the stem of a piston in a casing. In this pinion is a pin attached to the engineer's brake valve lever. On danger conditions appearing, the piston in the casing is moved to cause the gear rack to move the pinion to engage the pin on the engineer's brake valve to move the latter to a service position. This piston is in a casing separate from the rack and gearing. The rotary valve does not extend into this piston casing.

Powers No. 752,101, issued February 16, 1904, shows structure by which pressure from a piston chamber causes the piston to pull upon a rod to turn a member until one of the notches therein engages a pin on the engineer's valve lever and thus moves the latter to a braking position. The engineer's valve lever is rigidly attached to the rotary valve stem and may be moved forward to give an emergency application. The valve of the stem does not extend into the piston chamber, and the connecting mechanism is outside the piston chamber. This patent seems to be the equivalent of defendant's structure.

In Byrd No. 879,032, issued February 11, 1908, is shown a curved piston casing mounted on top of the engineer's brake valve. Under danger condition the head of the piston is moved forward to move the engineer's brake handle to the service position. The engineer may move the brake handle to give an emergency brake application or may move it back to release the brakes.

Price No. 923,297, issued June 1, 1909, shows a casing mounted on top of the engineer's brake valve. In this casing is a piston held up by a spring adaptably forced downward upon appliance of air currents under danger conditions. This device shows that the bevel edge of the piston engages lug on the rotary valve stem. Through the pressure of air the engineer's brake valve is forced to a service position. The engineer, however, is free to move the lever forward to an emergency position or back against the spring pressure.

Gerlach No. 1,135,574, application filed May 6, 1913, patent issued April 13, 1915, shows an electric motor, instead of a steam pressure piston, mounted on the engineer's valve casing. When danger condition is shown, the motor drives a plate which engages a pin on the engineer's brake valve handle to move it to service position. The engineer may, however, move it forward to emergency or back to release.

Warren British patent, No. 9,925, issued in 1907, shows an engineer's brake valve lever attached to the rotary valve stem. Upon the occurrence of danger conditions pressure on a small piston causes a lever to engage the brake valve lever and move it to service position.

It is plaintiff's claim that the casing on defendant's device is the equivalent of plaintiff's casing even though the defendant's is located on the side of the brake valve casing. Assuming this to be the fact, the prior art, as shown above, discloses a casing positioned relatively as is defendant's casing, and assuming that defendant's oscillatory valve is the equivalent to plaintiff's oscillatory valve, the equivalent of these is found in these prior art patents. Attention has been directed by defendant to numerous patents, including Barnes No. 1,216,049, Bosenbury No. 1,297,437, Murray No. 1,265,943, and Sprague No. 1,581,094, for which applications in each instance were made subsequent to 1913, when it is claimed that the drawings for the plaintiff's patent were first made. It is defendant's contention that the evidence supports the conclusion that the drawings were not made and no proof that anything was done with reference to patent application until 1915. Since I find that the art disclosed equivalent devices prior to the date of the alleged conception of this patent, as claimed by the plaintiff, it is unnecessary to determine when the actual conception was.

Plaintiff shows a casing through which a stem extends and an oscillatory member therein. Defendant does not show such a casing. Defendant has "reciprocating" pistons. Plaintiff has a single oscillatory member. Defendant shows gearing between rotary valve stem and the piston. Plaintiff does not show this. In defendant's structure pressure is supplied to prevent brake application. The release of pressure causes brake application. The reverse action is employed by plaintiff. In defendant's device when there is an automatic application of the brakes, defendant's lever is then disconnected from rotary valve and piston. Hence the engineer then has no force to move his rotary valve except in a forward movement to make an emergency application of the brakes. Pressure must be supplied to chamber to restore the pistons to the position as it was before the automatic application. It seems to me that defendant's system with respect to its actuator is not functionally or structurally equivalent to the plaintiff's.

It is claimed that plaintiff is guilty of laches, and that therefore it is not equitable as against the defendant to grant the relief sought. In 1921 a public demonstration of defendant's system was made on the Buffalo, Rochester & Pittsburgh Railroad. Detailed accounts of such demonstration were published in the public newspaper and in a technical journal. These publications were to such extent that it might be assumed with reason that the patentee of claim 11 must have been informed of such demonstration at about the time thereof. Further, patentee was directly interested in train control systems or devices, and it is scarcely conceivable that patentee did not know of the defendant's system at about the time it was first publicly demonstrated and advertised. In 1925 there was a public advertisement of the defendant's system. It was installed on the Southern Railway in 1925 and in the New York Central lines in 1925–1926. This suit was commenced in 1929. While the delay intervening 1921 and 1929 was long and it does lend strength to the belief that the plaintiff's patentee did not consider that there was any infringement by defendant, patentee is not liable for laches such as would deny the right to claim infringe-

ment. I do not think, however, that the delay is such as to charge plaintiff with laches as applied to the suit. "Laches" is not merely delay, but delay that works a disadvantage to another. Chase v. Chase, 20 R. I. 202, 37 A. 804. Long delay, standing alone, will not preclude a plaintiff from obtaining relief. It would have to act so as to amount to an estoppel—that is, so as to make a judgment unjust and inequitable. Temco Mfg. Co. v. National Electric Tickett Register Co. (D. C.) 33 F.(2d) 777.

Findings of fact and conclusions of law may be submitted to conform to the foregoing opinion, and the same shall be, and be considered to be as and for, a part of this opinion.